# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**JAMES B. WHITTAKER,**<br><br>               **Debtor**<br>———————————<br><br>**BENJAMIN H. WHITTAKER III, in his** <br>  **individual capacity and in his capacities as** <br>  **Administrator of the Estate of Benjamin H.** <br>  **Whittaker, Deceased; Administrator of the** <br>  **Estate of Mary S. Whittaker, Deceased; Co-** <br>  **Successor Trustee of the Benjamin H.** <br>  **Whittaker Trust u/a May 1, 1992; and Co-** <br>  **Successor Trustee of the Mary S.** <br>  **Whittaker Trust u/a May 1, 1992,** <br>**CAROL BELL, in her individual capacity and** <br>  **in her capacities as  Co-Successor Trustee** <br>  **of the Benjamin H. Whittaker Trust u/a** <br>  **May 1, 1992; and Co-Successor Trustee of** <br>  **the Mary S. Whittaker Trust u/a May 1,** <br>  **1992, and** <br>**JOAN MUMMERY, in her individual capacity** <br>  **and in her capacities as Co-Successor** <br>  **Trustee of the Benjamin H. Whittaker** <br>  **Trust u/a May 1, 1992; and Co-Successor** <br>  **Trustee of the Mary S. Whittaker Trust u/a** <br>  **May 1, 1992,** <br>               **Plaintiffs** <br><br>**v.**<br><br>**JAMES B. WHITTAKER,**<br>               **Defendant** | **Chapter 7**<br>**Case No. 13-15310-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 14-1017** |

## MEMORANDUM OF DECISION

By their complaint in this adversary proceeding, the three plaintiffs, all siblings of the chapter 7

debtor, seek a determination that the claims they assert against him are excepted from discharge under

11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). Their underlying claims, which remain unadjudicated, are for

breaches of the defendant's duties as trustee of two *inter vivos* trusts and as attorney in fact under

durable powers of attorney from the parties' father and mother.  After a trial on the merits, I now enter

the following findings of fact and conclusions of law.

**PROCEDURAL HISTORY**

On September 5, 2013, defendant James B. Whittaker ("Jay" or "the Debtor") filed a petition for

relief under Chapter 7 of the Bankruptcy Code. On January 21, 2014, and in the bankruptcy case thereby

commenced, the plaintiffs filed the complaint that commenced the present adversary proceeding.[1] The

complaint includes a count objecting to discharge under 11 U.S.C. § 727(a), and for that reason alone,

the Debtor has not yet received a discharge. The plaintiffs have since withdrawn the count objecting to

entry of discharge, and therefore upon resolution of this proceeding, the Debtor will receive a discharge.

The purpose of the present proceeding is to determine whether the plaintiffs' claims will be excepted

from that discharge.

The plaintiffs are Benjamin H. Whittaker III, Carol Bell, and Joan Mummery (collectively, "the

Plaintiffs"), each appearing individually and as a co-successor trustee of the Benjamin H. Whittaker Trust

u/a May 1, 1992 and of the Mary S. Whittaker Trust u/a May 1, 1992. Benjamin H. Whittaker III also

appears as administrator of the estates of the parties' deceased parents, Benjamin H. Whittaker and

Mary S. Whittaker ("the Parents"). The complaint is based on allegations that by a combination of risky

---

[1] The Debtor does not dispute the timeliness of the complaint. The deadline for filing a complaint to determine the dischargeability of a debt under § 523(a)(2), (4), or (6) was the sixtieth day after the first date set for the § 341 meeting of creditors. Fed. R. Bankr. P. 4007(c). Here the sixtieth day was December 16, 2013. As that date neared, the Plaintiffs moved for an extension of the deadline, the Debtor opposed the motion, and, after a hearing held on January 14, 2014, the Court denied the motion. However, by local rule of this court, the deadline was nonetheless automatically extended to the date seven days after entry of the order determining the motion. See MLBR 9006-1 ("If the Court does not determine any motion to extend any deadline for filing complaints relating . . . to the dischargeability of a debt, . . . which motion was filed before the expiration of the deadline, the deadline shall be automatically extended to the date seven (7) days after the entry of the order determining the motion, unless the Court orders otherwise."). The Plaintiffs timely filed their complaint on January 21, 2014, the seventh day after entry of the order determining the motion.

investments and self-dealing, the Debtor, as trustee of two *inter vivos* trusts of which he and the

Plaintiffs were beneficiaries, and as attorney-in-fact for each of the Parents, breached his fiduciary

duties to the Plaintiffs and the Parents and thereby lost virtually all of the value in the trusts.

Their complaint is organized into four counts. In Count I, the Plaintiffs assert that their claims

against the Debtor should be excepted from discharge under § 523(a)(2)(A), as debt arising from false

pretenses, false representations, or actual fraud. This count is based on allegations that, by affirmative

misrepresentations to the Plaintiffs of the financial health of the *inter vivos* trusts, and also by failure to

apprise them of dramatic changes in his investment strategy, the Debtor prevented the Plaintiffs from

intervening and thereby averting losses.

Count II contains four separate sub-counts, each for a determination of nondischargeability

under § 523(a)(4). In the first ("Count II.i"), the Plaintiffs contend that the Debtor's liability to them for

failing to invest the funds as a "prudent investor" is excepted from discharge under § 523(a)(4) as a debt

for a defalcation while acting in a fiduciary capacity.  In the second and third ("Counts II.ii and II.iii"), the

Plaintiffs contend that the Debtor's liability to them for his unauthorized appropriation for his own use

of $107,500 that he used to purchase a time share and $38,000 that he transferred to his personal

investment account should be excepted from discharge under § 523(a)(4) as debts "for embezzlement

or larceny" within the meaning of that subsection. And in the fourth ("Count II.iv"), the Plaintiffs

contend that the Debtor's failure to inform them of the declining balances in his trust accounts

amounted to, and should be excepted from discharge under § 523(a)(4) as, fraud or defalcation while

acting in a fiduciary capacity.

Count III also contains four sub-counts, each for a determination that certain of the Plaintiffs'

claims are excepted from discharge by § 523(a)(6), which excepts from discharge debts for "willful and

malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §

523(a)(6). The Plaintiffs seek such a determination as to the Debtor's liability to them for failing to invest

the funds as a prudent investor ("Count III.i"), for his unauthorized appropriation for his own use of

$107,500 of entrusted monies ("Count III.ii"), for his unauthorized appropriation for his own use of

another $38,000 of entrusted monies ("Count III.iii"), and for his failure to account for trust assets and

false representations to the Plaintiffs about the state and management of the trust assets ("Count

III.iv").

Count IV is the Plaintiffs' objection under 11 U.S.C. § 727(a) to the Debtor's receipt of a

discharge. The Plaintiffs withdrew this count on the record at trial.[2]

Before trial, the Plaintiffs moved for partial summary judgment. The Court granted the motion

as to Count II.ii and denied it as to the remainder of the relief sought. As to Count II.ii, the Court held

that the Debtor's liability for his unauthorized appropriation for his own use of $107,500 of entrusted

monies is excepted from discharge under § 523(a)(4) as a debt "for embezzlement" within the meaning

of that subsection. The ruling applies to the $107,500 that the Debtor withdrew from the trust and used

to purchase a timeshare unit for his and his wife's enjoyment.

The parties submitted a joint pretrial memorandum, which included an extensive stipulation of

facts. The matter was tried in a single day. Three witnesses testified at trial: defendant James Whittaker

and Plaintiffs Joan Mummery and Benjamin H. Whittaker III. All exhibits were admitted by agreement.

After trial, the parties submitted proposed findings and conclusions, and the Court then heard closing

arguments.  After closing arguments the parties submitted supplemental briefing regarding the

dischargeability of any attorney's fees to which the Plaintiffs would be entitled on claims deemed to be

excepted from discharge.

---

[2] Transcript, p. 13.

**FINDINGS OF FACT**

    **A. Debtor's Background in Finance and Investments**

    1.    The Debtor, James Whittaker, known to his siblings, as Jay, is the oldest of the four

siblings. His siblings, all plaintiffs herein, are Benjamin H. Whittaker III ("Ben"), Carol Bell ("Carol"), and

Joan Mummery ("Joan"). Jay, Ben, Carol, and Joan are the children of Benjamin H. Whittaker ("the

Father") and Mary S. Whittaker ("the Mother").

    2.    The Debtor received a Bachelor of Science degree in Economics from Miami University

of Ohio in 1965 (Stipulation of Facts, ¶ 1) and a Master in Business Administration degree in Economics

from the same institution (Stipulation of Facts, ¶ 2).[3] He completed all coursework and the exam for a

Ph.D. in Economics from Case Western Reserve University but chose not to finish his dissertation.

(Stipulation of Facts, ¶ 3)  In 1974, he received an M.B.A. in Finance from Case Western Reserve.

(Stipulation of Facts, ¶ 4) He is a Chartered Financial Analyst, which is a credential often held by people

in the investment industry who oversee mutual and pension funds. (Stipulation of Facts, ¶ 5)

    3.    The Debtor was a Credit Manager for Medusa Cement Company from approximately

1971 to 1974 (Stipulation of Facts, ¶ 6) and then was employed by Digital Equipment Corporation from

1974 through 1991 (Stipulation of Facts, ¶ 7). He began his employment with Digital Equipment

Corporation as a credit manager and subsequently headed up their computer leasing operation.

(Stipulation of Facts, ¶ 8) The Debtor subsequently took a position as corporate finance manager, where

he was involved with convertible bond issues, stock issues, financing of real estate and multi-million

dollar purchases of equipment for the purposes of depreciation. (Stipulation of Facts, ¶ 9) In 1982, the

Debtor was made Chief Economist for the company and held that position until 1991. (Stipulation of

---

[3] At trial, the Debtor testified credibly that his master's degree in economics from Miami University was a master of arts degree, not a master of business administration. The discrepancy is of no consequence.

Facts, ¶ 10) He was also a security analyst for several industries during that time period. (Stipulation of

Facts, ¶ 11)

4.      In or about 1995, the Debtor decided to become a financial advisor so he went to

Bentley College and got a certificate in Financial Planning. (Stipulation of Facts, ¶ 12) He then started a

financial advisory firm for individuals called Alden Associates that operated from 1996 to 1997.

(Stipulation of Facts, ¶ 13) Alden Associates did financial planning and managed investments by

obtaining power of attorney from individuals to invest their money with larger investment firms such as

Charles Schwab or Fidelity. (Stipulation of Facts, ¶ 14)

5.      In the late 1990s the Debtor started a company called Deep Green Research with Glenn

E. Frank. (Stipulation of Facts, ¶ 15) Deep Green Research was formed to develop artificial intelligence

software for optimizing investments to minimize taxes with the objective to sell the software to a large

investment firm. (Stipulation of Facts, ¶ 16) In approximately 2000, the Debtor decided to sell his

interest in Deep Green Research to his partner. (Stipulation of Facts, ¶ 17) The Debtor has not held a

salaried position since this time. (Stipulation of Facts, ¶ 18)

6.      About this time, in or around 2000, the Debtor started to do research on trading

options. (Stipulation of Facts, ¶ 19) The Debtor's research on options trading was limited to reading

books on the subject, taking three courses or seminars and online training offered by brokerage firms.

(Stipulation of Facts, ¶ 20) He considers himself to have greater knowledge than the average individual

with respect to investments in general.

7.      The Debtor has acknowledged that investing in options is a high risk endeavor.

(Stipulation of Facts, ¶ 21) He described an option as a contract, either a "call" or a "put." Without

getting into much detail at all, he explained that a call contract pays off when an underlying stock goes

up, and a put contract pays off when the underlying stock goes down. He further explained that an

option contract is a "derivative," meaning its value is contingent on the performance of another stock or

asset. For example, he explained, "in put contracts, you're betting the stock will go down." The Debtor

explained that an option "is a highly leveraged vehicle" and conceded at several junctures that it is a

high risk investment.[4] Asked to explain his use of the word "bet" to explain an option trade, he stated

that he had used the term as it is used colloquially in the financially industry, to mean "an investment

judgment." Although he distinguished it from betting in the sense that roulette is betting, he did not

explain how or to what extent they differed. He never shrunk from conceding that, whatever measure of

"investment judgment" an options contract may involve, it remains highly risky.

8.      From 2000 to 2003, the Debtor began trading on options for himself on an account with

a specialized brokerage firm called TradeStation. (Stipulation of Facts, ¶ 22)  In or around 2000 to 2002,

he lost a "huge amount" of money trading options, quit doing it, and went back to "studying."[5]

(Stipulation of Facts, ¶ 23) The Debtor testified credibly that the amount he lost during this period was

"more than half a million" dollars, all of it his own, and that this constituted most of his money at that

time.

9.      He began trading options again in or around 2007, this time with his own money and

also with money belonging to his wife, which she held in a Roth IRA.

10.     In or about 2009 or 2010, the Debtor lost approximately $200,000 of his wife's Roth IRA

by investing in options (Stipulation of Facts, ¶ 24). In this same period he also lost other monies of his

own from trading in options. He admitted credibly that his options trading losses of his own and his

wife's funds in the periods 2000-2003 and 2009-2010 totaled "over a million dollars of our retirement

accounts, including all of mine."

---

[4] Aside from this testimony by the Debtor, the Plaintiffs submitted no evidence as to what precisely an option is and how option trading works.
[5] The word studying appears in quotation marks in the parties Stipulation of Facts. The purpose of the quotation marks is not evident.

**B. The Family Trusts**

11.     Prior to his death, the Father entered into his Amended and Restated Revocable Living Trust Agreement on May 1, 1992, with Carol Bell as Trustee, pursuant to the terms of which the Debtor was designated as a Successor Trustee (hereinafter "Father's Trust" and, together with Mother's Trust, below, "Family Trusts" or "Trust" or "Trusts"). (Stipulation of Facts, ¶ 25) The Father's Trust stated, at Article IX, ¶M(1), that "[i]n the event that my said daughter [referring to Carol Bell] shall become unwilling or unable to continue to serve as Trustee hereunder, then my son, James B. Whittaker, of Wellesley Massachusetts, shall serve as Trustee hereunder." The Debtor was not a signatory to this Amended and Restated Revocable Living Trust Agreement of May 1, 1992, regarding the Father's Trust.

12.     Prior to her death, the Mother entered into her Amended and Restated Revocable Living Trust Agreement on the May 1, 1992, with Carol Bell as Trustee, pursuant to the terms of which Debtor was designated as a Successor Trustee (hereinafter "Mother's Trust" and, together with Father's Trust, above, "Family Trusts" or "Trust" or "Trusts"). (Stipulation of Facts, ¶ 26) The Mother's Trust stated, at Article IX, ¶M(1), that "[i]n the event that my said daughter [referring to Carol Bell] shall become unwilling or unable to continue to serve as Trustee hereunder, then my son, James B. Whittaker, of Wellesley Massachusetts, shall serve as Trustee hereunder." The Debtor was not a signatory to this Amended and Restated Revocable Living Trust Agreement of May 1, 1992, regarding the Mother's Trust.

13.     Each of the Amended and Restated Revocable Living Trust Agreements of May 1, 1992, purported to modify, amend, and restate a trust agreement entered into on July 11, 1980. No trust agreement of July 11, 1980 was introduced into evidence.[6]

---

[6] No party contends that the 1980 trust agreement or agreements are necessary to understand the Father's Trust and the Mother's Trust for purposes of this adversary proceeding.

14.     Under the terms of the Family Trusts, the Parents designated the Plaintiffs, the Debtor,

and all of their (the Parents') grandchildren as the residuary beneficiaries of the Trusts after the death of

both Parents (after expiration of one or more lifetime trusts for the benefit of the surviving Parent).

(Stipulation of Facts, ¶ 27)  Also, under the terms of the Father's Trust, the Father was a beneficiary of

the Father's Trust during his lifetime; and under the terms of the Mother's Trust, the Mother was a

beneficiary of the Mother's Trust during her lifetime.

15.     At all relevant times, the Debtor, Joan, and Ben have understood that under the

operative testamentary provisions, after the death of both parents, each of their four children would

receive 20 percent of the Trust estates, and their grandchildren, of whom there were nine, would share

the last 20 percent in equal parts. The Debtor therefore had an expectation of receiving one-fifth of the

Trusts' estates remaining upon the death of the last parent to die, and his siblings and his and their

children collectively had a four-fifths interest in those estates. The Debtor has two children, so two-

ninths of 20 percent would have gone to his children.

16.     Each Family Trust included the following regarding the powers of its trustee:

> In the administration of the trusts created hereunder and in addition to the powers
> exercised by trustees generally, the Trustee shall have the following powers and
> authorities without any court order or proceeding, exercisable in the discretion of the
> Trustee: . . .
>
> > 4.      To invest and reinvest the properties from time to time comprised in
> > the trust estate or estate in stocks, common and/or preferred, bonds,
> > notes, debentures, loans, mortgages, common trust funds, or other
> > securities or property, real or personal, all limitations now or hereafter
> > imposed by law, statutory or judicial, or by any rule or practice of court
> > now or hereafter in force specifying or limited the permissible
> > investment of trustees, trust, companies or fiduciaries generally or
> > requiring the diversification of investment, being hereby expressly
> > waived, it being the intent hereof that the Trustee shall have full power
> > and authority to deal with the trust estate or estates in all respects as
> > though it were the sole owner thereof, without order of court or other
> > authority; . . . [and]
> >
> > 10.     To hold title to stocks, bonds, or other securities or property, real or
> > personal, in its own name or in the name of its nominee and without

> indication of any fiduciary capacity or to hold any such bonds or
> securities in bearer form; the Trustee shall assume full responsibility for
> the acts of any nominee elected by it[.]

Father's Trust, Article IX, ¶ B.4; Mother's Trust, Article IX, ¶ B.4.

17.     Each Family Trust included the following regarding the duties of its trustee:

> The Trustee shall keep accurate records showing all receipts and disbursements
> and other transactions involving the trust estate or estates and shall furnish to
> each income beneficiary of the trust estates annually a statement of the
> receipts and disbursements affecting such beneficiary's interest in the trust
> estate and a complete inventory of the trust estate then held for the benefit of
> such beneficiary.

18.     The Family Trusts contain a choice of law clause whereby Florida law is to govern.

(Stipulation of Facts, ¶ 28) The choice of law clause in each Family Trust states "[t]his amendment to

Trust Agreement shall be construed under and in accordance with the laws of the State of Florida."

19.     Each Trust indicates that it was entered into and signed at Key West, Florida, and each

identifies its settlor as being "of Key West, Florida."

**C.  Debtor's Role of Trustee and Attorney in Fact**

20.      In the fall of 2006, the Parents moved from their home to an assisted living facility

outside of Cleveland, Ohio.

21.     On September 19, 2006, Carol resigned as trustee under both the Father's Trust and the

Mother's Trust, effective as to each trust upon acceptance of its trusteeship by the successor trustee.

Carol did not testify at trial. The Debtor testified credibly, and without contradiction, that Carol resigned

because the trusteeship required more direct involvement on her part than she had thought it would.

Carol was the only one involved in asking the Debtor to take over as trustee of both trusts.

22.     In October of 2006, the Debtor became the trustee of each Family Trust. (Stipulation of

Facts, ¶ 29)  On October 3, 2006, the Debtor, by execution of an Acceptance of Trusteeship as to each

Family Trust, accepted the duties and obligations of the trustee under each Family Trust, accepted the

10

trust estates, and agreed to hold the same upon the trusts and for the purposes and on the terms and provisions set forth in their respective trust agreements.

23.      The Debtor held the position of trustee of each Family Trust until June of 2012, when he resigned. (Stipulation of Facts, ¶ 30)

24.      On October 3, 2006, the Debtor also agreed to serve as his parents' Attorney in Fact and, in connection therewith, executed Power of Attorney agreements related to the Family Trusts. (Stipulation of Facts, ¶ 31) The Durable Powers of Attorney required the Debtor to exercise his authority, power, and discretions in a fiduciary capacity in observance of the standards of care applicable to trustees under Florida law. (Stipulation of Facts, ¶ 32) The Powers of Attorney also elected a higher standard of care to be exercised by the Debtor in his fiduciary capacity as his Parents' Agent. (Stipulation of Facts, ¶ 33)

25.      Moreover, the Debtor's parents required that the funds in the Trust be invested conservatively.  (Stipulation of Facts, ¶ 34) The Debtor agreed that his parents' instruction to him was to invest their funds conservatively. He acknowledged that high-risk investments were against his father's wishes.

**D.  Trust Assets**

26.      When the Debtor took over as Trustee, the Trust contained two bank accounts, one with KeyBank and another with First State Bank. (Stipulation of Facts, ¶ 36)  The Trust also contained three (3) investment accounts, held with Fidelity, Merrill Lynch, and Vanguard. (Stipulation of Facts, ¶ 37) Further, the Trust contained two pieces of real estate, one in Euclid, Ohio and one in Key West, Florida. (Stipulation of Facts, ¶ 38) The Key West house had four rental units that generated income for the Trust, though not always a net profit.

27.     In October of 2006, the Defendant combined his Parents' Merrill Lynch, Fidelity, and Vanguard investment accounts into one single Fidelity account titled in Father's name. (Stipulation of Facts, ¶ 39)

**E.  First Two Reports to Siblings**

28.     The Debtor gave a total of three (3) reports to his siblings during his time as Trustee. (Stipulation of Facts, ¶ 60)  All three were in writing. The Debtor never gave an oral report to any of his siblings, and none of them ever asked for an oral report or contacted him to discuss any of the three written reports.

29.     On or about January 31, 2007, the Debtor sent a report to his siblings (the "January 2007 Report"). (Stipulation of Facts, ¶ 61) This report, a single-page document in memorandum format, addressed to his three siblings, was the first of the three reports. It begins: "Dad has authorized me to give you a summary of their [the Parents'] assets."

30.     The January 2007 Report summarized the assets at that time and also outlined the Debtor's father's investment strategy to invest most of their assets in U.S. Government Bonds and Money Market instruments. (Stipulation of Facts, ¶ 62)  Regarding investments, it stated: "For the past 15 years or so Dad has invested most of their assets in U.S. Government Bond and U.S. Government Money Market Instruments. He also has relatively small positions in a utilities mutual fund and stock in BP and Exxon-Mobile which he bought about 3 years ago[.]" It also indicated that the values of the investments as of December 31, 2006 were as follows:

| | |
|---|---|
| Merrill Lynch—Dad | $433K |
| Fidelity—Dad | $167K |
| Vanguard—Mom | $472K |

This report is credible and not contradicted, and accordingly I find that the investments had a combined value on December 31, 2006, of $1,072,000. At the time of this report, the investments remained exactly as the Debtor had received them in October 2006; he had made no changes.

31.     Regarding the Trust's real estate, the January 2007 Report stated: "Real estate estimates are rough based on discussions people [sic] who know better than I. The Key West market is currently depressed and there is a glut of inventory on the market." It also indicated that the value of the real estate as of December 31, 2006, was as follows:

Euclid House              Est: ~$100K

Key West House          Est: ~$1-1.5 million

32.     The January 2007 Report also indicated that the Debtor's father had instructed him to invest only in U.S. Government Instruments, that this was not expected to change much, and that he would report to the siblings if there were a material change. (Stipulation of Facts, ¶ 63)  Specifically, the report stated: "Dad has instructed me to continue investing only in U.S. Government Instruments. As this isn't expected to change much, I will update you in one year unless there is a material change in the meantime."

33.     Joan and Ben received the January 2007 Report shortly after it was issued. On account of this report, Joan "took it very positively in that things seemed to be stable and going well and great." She testified credibly that she believed that the Debtor indeed was only investing in U.S. Government interests and that she relied on this document to guide her as to how investments were being made during his trusteeship. Ben, too, testified credibly that he understood this report to mean that the money was secure and that Jay was following their father's directive.

34.     On or about March 10, 2008, the Debtor transmitted a 2007 Year End report to his siblings (the "March 2008 Report"). (Stipulation of Facts, ¶ 64)  This was the second of his three reports to them.

35.     The report discussed the real estate, indicated that the investments were worth

$1,145,305.00, and indicated that their Parents' financial position was "strong and secure." (Stipulation

of Facts, ¶ 65) Regarding the investment accounts, this report said only: "Total financial Assets:

$1,145,305." Regarding income and expenses, this report stated that "income exceeds expenses and

should continue to do so"; and it further stated that estimated income and expenses for 2007 were

income of $99,316 and expenses of $88,000. Regarding the Euclid house, the report indicated that it had

been on the market for almost a year with "very little interest due to the weak real estate market." And

regarding the Key West house the report indicated all four of its units remained rented and generating

almost $60,000 per year in income, but repairs and maintenance brought the 2007 net income from that

house to $18,000.

36.     Joan and Ben received the March 2008 Report shortly after its transmittal on March 10,

2008. Both indicated that they read it upon receiving it, and both further noted, correctly, that its report

regarding the investment account gave no idea of a material change in the manner in which its funds

were invested. There is no evidence that, as of the date of this report, the Debtor had changed the

manner in which he was investing the funds in the investment account or planned to begin investing

differently. To the contrary, the evidence is that the funds remained very conservatively invested.

**F.  New Investment Strategies**

37.     The Debtor's strategy for investing the Trusts' funds began to change in September or

October of 2008.  It changed in two phases. The series of trades that comprised the first phase quickly

"paid off big time," but it emboldened the Debtor and set up the second phase, which proved

disastrous.

38.     The Debtor described credibly his first departure from the conservative strategy that his

father had enjoined him to follow. "In the summer and fall of 2008 you recall there was a stock market

crash. The stock market went down by 40-some percent. My parents' account was largely in very liquid

assets, such as cash or bonds, and there was a -- I saw a historical buying opportunity for stocks. And I sold much of their fixed income and bought high-quality stock issues . . . in the September or October range. These were like Caterpillar and General Electric and JPMorgan and so forth, Apple. And these subsequently went up about 30 to 40 percent and I was concerned with another dip in the market, so I sold all or most of them late 2008 or early 2009." Commenting on these investment moves, the Debtor testified: "that was an opportunistic thing to do and I thought reasonable and rational and it paid off big time."

39.    Though the amount of the profit from these trades is not in evidence, I credit the Debtor's testimony that they "paid off big time." They left the estate with a considerable profit and, in the Debtor's words, "a lot of cash." The Debtor testified that the value of the investment account had increased to around $1.2 or $1.3 million.

40.    The Debtor continued as to the second phase of his departure: "So after I sold the stocks I had a lot of cash and decided . . . to take a portion of the funds and manage it as I was managing my own money in options to get a larger return. So initially I set aside about 200,000 or about 20 percent of the portfolio and decided to trade options[.]" In short, at some point the Debtor decided to begin investing Trust funds in options.

41.    It is not clear when he made this decision and when precisely he began investing in options. The Debtor testified: "I don't recall exactly when it started, but it was around the end of '08, beginning of '09[.]" However, at another point, the Debtor also testified that he did not begin investing Trust funds in options until August 2009. I have no corroborating evidence that he invested Trust funds in options earlier than August 2009. I find that he did invest Trust Funds in options at least as early as August 2009, and, while I do not find that he did not invest Trust funds in options before August 2009, the Plaintiffs have not established that he did invest, or decide to invest, Trust funds in options earlier than August 2009.

### G. Third Report to Siblings

42.     Sometime after December 31, 2008, the Debtor submitted his final report regarding the

Trust to his siblings the "Third Report"). (Stipulation of Facts, ¶ 66)  The precise date of this report is

unclear. The Debtor testified it was probably before April 15, 2009, because in the report he stated that

he had not yet finished the Parents' tax returns for 2008. Still, it is unclear precisely how early in the

year it was made and whether it was made before the Debtor made his decision to begin trading Trust

monies in options.

43.     Regarding financial assets (the investment and the bank accounts), the Third Report

states only the following: "Financial assets totaled $904,551. At 12/31/08 including bank accounts. [sic]

This is after distributing $120,000 to the children and grandchildren."

44.     In the Third Report, the Debtor also indicated that he had finally sold the Euclid house in

May 2008, for $58,000.

45.     When the Debtor issued the Third Report, he had already departed from the investment

strategy that he had previously told his siblings he would follow: at the very least, he had, after the fall

of the stock market in 2008, sold some or all of the Trusts' conservative investments and, with the

proceeds, purchased what he called "high-quality stock issues." The Debtor deliberately omitted any

mention of this change of strategy from this report.

46.     It is unclear whether, by the date of this report, he had also sold that stock at a gain and

begun investing a portion of the portfolio in options. I cannot find by a preponderance of the evidence

that, by the date of this report, he had begun trading in options or decided to do so, and therefore that

the Debtor had anything to disclose to his siblings about option trading *in this report*.

47.     Nonetheless, the Debtor did eventually decide to invest Trust funds in options. The

Debtor acknowledged, and in any event I find, that this constituted a material change in investment

strategy and that he did not update his siblings as to that material change. This withholding of

information from his siblings was not merely negligent—he did not simply forget—but intentional and deliberate.

48.      In the three reports he made to his siblings, he did not indicate that he planned to depart from his father's wish of conservative investment of the Trust Assets. (Stipulation of Facts, ¶ 67)

49.      The Debtor acknowledged that he did not intend to keep supplying reports to his siblings because he did not want to report negative results to them and did not want them to find out what was going on with the Trust. (Stipulation of Facts, ¶ 68)

**H.  Misappropriation of Funds for Timeshare**

50.      On April 27, 2009 and on May 1, 2009, the Debtor wrote two checks against the Fidelity investment account in which he maintained the Trusts' investments, both payable to himself:  the first for $58,500 and the second for $49,000.  He used the funds thereby transferred to pay for a timeshare in Mexico that he purchased and owned jointly with his wife.

51.      The Debtor acknowledged that these withdrawals were unauthorized and made for personal use.  (Stipulation of Facts, ¶ 58)

52.      The total amount of unauthorized Trust funds that the Debtor admitted were used to pay for the timeshare purchased by the Debtor and his wife was $107,500.00. (Stipulation of Facts, ¶ 55)

53.      Both the Debtor and his wife have visited the timeshare over the years. (Stipulation of Facts, ¶ 56)

54.      The funds taken from the Trust by the Debtor to pay for the timeshare purchased by the Debtor and his wife have never been paid back into the Trust. (Stipulation of Facts, ¶ 57)

**I.  Funds Diverted to TradeStation Account**

55.      On four separate dates, beginning July 12, 2009, the Debtor transferred funds totaling $38,000 from the Fidelity investment account in which he maintained the Trusts' investments into an

investment account belonging to himself and his wife at an on-line brokerage known as TradeStation. These transfers were effected by four checks:

> a.  the first, dated July 12, 2009, is in the amount of $13,000 and made out to the Debtor;
>
> b.  the second, dated August 24, 2009, is in the amount of $6,000 and made out to the Debtor;
>
> c.  the third, dated February 5, 2010, is in the amount of $13,000 and made out to TradeStation Securities; and
>
> d.  the fourth, dated July 20, 2010, is in the amount of $6,000 and made out to TradeStation Securities. It bears a note stating: "IRA Contribution 2010."

56.    The funds taken from the trust and transferred into the TradeStation account were never paid back into the Trust because the Debtor lost those funds investing. (Stipulation of Facts, ¶ 59) The Debtor invested and lost these transferred monies, all of them, in trading options.

57.    At trial, the Debtor testified that the purpose of these transfers was to enable him to use certain specialized tools for trading options that were available only on the TradeStation platform. He testified: "TradeStation is a specialized brokerage firm that has specialized analysis and trading software for options and in order to use the software I needed to have a balance in the account. I tried to open an account for my father. They wouldn't let me. So I took this money and put it in -- I guess, my wife and I joint account and for the purposes of being able to trade using that plat -- that trading platform and analysis platform and then the idea was to put the money back, so this was moving it to trade it somewhere where I had the tools to trade." The gist of this testimony is that he moved the funds to his own TradeStation account only to better administer those funds for the Trusts; and the transfer did not effect a change of ownership, just of location, it having been his intention all along to return the funds to the Fidelity Account. This is the Debtor's story.

58.     For the following reasons, I find this testimony not credible.  First, it is inconsistent with the notation on the fourth check, "IRA Contribution 2010." The Debtor treated this deposit as an IRA contribution, which he can properly have done only if the funds were being treated as his own, not being administered for the benefit of the Trusts.  Second, in earlier deposition testimony, he admitted that each of these four transfers had been improper: "they were unauthorized loans. I was not permitted to do that and I meant to pay them back." Third, he offered no corroborative evidence about the features of the TradeStation platform, of the necessity of having a balance in the account, why it did not suffice to have his own money in the account (he indicated that he had a total of three personal TradeStation accounts), how much of a balance was necessary to utilize the special features, why it was necessary not just to have a balance in the account but also to trade through it, and why it was necessary to transfer not just one, but four, payments over time into that account in order to use the special features. Fourth, as he acknowledged, he was able to and did trade options extensively through the Fidelity Account, albeit without the special tools. And fifth, he had already misappropriated $107,000 of the Trusts' funds for his timeshare, demonstrating a lack of compunction about taking or "borrowing" Trust funds for his own purposes. I find that these transfers were intended as further appropriations for his own use.

**J. Loss of investment Accounts**

59.     In or about 2009, the Debtor made the decision to start investing the Trusts' funds in options. (Stipulation of Facts, ¶ 42) No later than August of 2009, he began investing the Trusts' funds in options.

60.     Though he is less than clear on the issue, the Debtor implies, or at least seems to imply, that his initial strategy was to limit the risk of investing in options by limiting the portion of the investment account that that he might subject to that risk. He testified: "I had a lot of cash and decided . . . to take *a portion* of the funds and manage it as I was managing my own money in options to get a

larger return. So initially I *set aside* about 200,000 or about 20 percent of the portfolio and decided to trade options[.]"[7] Whatever he may have meant by use of the words "portion" and "set aside," I find that the Debtor did not, at the outset or ever, intend to limit the portion of the portfolio that he might invest in options. The basis for this finding is that, as will become evident below, the Debtor never showed any regard for a limit of $200,000 or 20 percent or any amount.

61.     The Debtor testified that he decided to invest in options "with the objective of increasing the value of the account, not for my parents, but for the heirs," his parents' children and grandchildren. He decided that this was an appropriate objective because his parents had more money than they would ever spend and had therefore authorized him as trustee "to give some of the money to their children," the Debtor and his siblings. From these facts he inferred that his objective as trustee was to manage the Trusts for the benefit of the heirs, that is, the residual beneficiaries of the Trusts. "[A]nd that's . . . when and why I started trading options." I credit this testimony but further find that the Debtor himself, as a one-fifth residual beneficiary/heir, had a substantial interest in increasing the amount available for distribution to the residual beneficiaries. He was especially so motivated because (i) he had lost at least $500,000 of his own money to options between 2000 and 2002, (ii) he had already "borrowed" $107,500 from the Trusts to purchase his Mexican timeshare and another $38,000 to invest with in his own name and needed to raise the money to repay these, and (iii) during the same period as he was investing the Trusts' funds in options, he was also losing another $500,000 of his and his wife's retirement funds in options. In short, he needed the money.

62.     He failed to tell any of his siblings of his decision to start investing the Trust's funds in options because he did not want them "looking over my shoulder and questioning every action I made." (Stipulation of Facts, ¶ 43) More specifically, he did not want them looking over his shoulder because he had already appropriated Trust funds for his own purposes, he knew that options investments were high

---

[7] Trial transcript p. 104 (emphasis added).

risk, he knew that his own track record with options was catastrophic, and he knew that he could not justify such high-risk behavior to his siblings.

63.     The evidence includes the Trusts' monthly statements from Fidelity Investments, showing all activity on the Fidelity Account from September 1, 2009, through December 31, 2011. This activity, plus the activity on the account for August 2009, is summarized in attached Exhibit A, which, for the most part, replicates a summary that the Plaintiffs submitted under Federal Rule of Evidence 1006.[8] For each month it shows the beginning and ending values of the account's investments as a whole, the change in market value of the investments from the beginning to the end of the month, the withdrawals from and additions (deposits) to the account in that month, the change in market value of the investments net of additions and withdrawals (to show the net gain or loss from investments in that month),[9] and the distribution of the account's investments according to type (stocks, bonds, options, mutual funds, cash) as of the end of the month. The summary does not show individual transactions, the gains and losses thereon, and the components of the net change in the investments' value from beginning to end of each month.

64.     As of the beginning of August 2009, the total value of the account's investments was $1,131,162.91. This is the first month in which the Court has evidence that the Debtor traded funds from this account in options. During this month, the investments had a net *increase* in value of $49,071.50. At months' end, 12% of the account's investment value was in options.

---

[8] Debtor's counsel stated on the record that he had reviewed this compilation and determined that it was an accurate representation of the numbers contained in account statements that it summarized. Though I do not rely on the summary alone, I too find that it accurately summarizes the underlying account statements.

[9] The column for change in account value net of additions and withdrawals was added by the Court and is wholly derived from other numbers in the summary. It is equal to the monthly change in market value of the account's investments, plus amounts withdrawn and minus amounts deposited in that month (if any); it is intended to isolate the portion of the monthly change in value that is attributable to the change in the value of investments. All other data in Exhibit A is as supplied by the Plaintiff.

65.     As of the beginning of September of 2009, the value of the account's investments was $1,169,234.41. (Stipulation of Facts, ¶ 40) This proved to be their high value over the period summarized in Exhibit A. In this month, the investments' value dropped by $18,417.88. At months' end, 11% of the account was invested in options.

66.     During October of 2009, the investments' value dropped more precipitously, by $124,485.04. At months' end, 31 percent of the account—the account's total market value at that time was $1,026,331.09—was invested in options, and this percentage only increased in the following month.

67.     Thus, after net losses of only $93,000, the Debtor had already invested some $400,000 in options (the $93,000 already lost, plus 31 percent of the remainder), well in excess of the $200,000 that he testified he initially "set aside" for options. The Debtor showed absolutely no resolve to respect and enforce any limit on the portion of the account he might invest in options. Rather, as he testified, he could never stop with a net loss. He treated losses always as a reason to invest more in options, in an attempt to reverse the damage.

68.     I find that the Debtor could not stop with losses, not only because they were losses but also because they would eventually expose investment decisions that he could not defend. As losses mounted, this dynamic became all the more intense.

69.     November of 2009 was a catastrophic month for the investment account. The investments declined in value by $535,430.52, representing 52 percent of the value remaining at the beginning of that month. Still the Debtor did not discontinue or reduce the extent of his options trading. At months' end, 36 percent of the account's investments were in options.

70.     Over the next eight months, the Debtor's trading in options continued unabated.  Gains of $97,245.79 and $94,866.44 in December 2009 and January 2010 were wiped out by losses of $34,623.02 and $157,109.30 in February and March 2010. Substantial gains of $161,267.22 and $202,619.37 in May and July 2010 were more than wiped out by losses of $34,930.71, $89,822.32, and

especially $387,987.23 in April, June, and August 2010. As of September 1, 2010, the account had a

value of $114,727.21.  The Debtor lost all but $6,157.62 of that sum to options investments in

September and October 2010.

71.     Over the next eleven months, the Debtor continued to invest the remainder in options.

By the end of September 2011, he had lost all but $29.21 of the account's value. He made no further

trades after September 2011.

72.     As of December 31, 2011, through the Debtor's withdrawals and losses, the Fidelity

Account had a value of $29.21. (Stipulation of Facts, ¶ 41)

73.     The Debtor lost the portion of the funds that he had designated for options trading.

(Stipulation of Facts, ¶ 44) After he lost these funds, the Debtor abandoned his strategy and called his

continued investment in options a "desperate act to try to make it up" by investing more. (Stipulation of

Facts, ¶ 45)  The Debtor admitted to making bad decisions regarding his parents' accounts and

"compounding the bad decisions by trying to make up for it with more bad decisions."[10] (Stipulation of

Facts, ¶ 46)

74.     When asked why he did not stop trading options when the losses first started, he

responded: "I didn't want to stop with losses and so I decided to put some more money in in order to

make up the gains. I'm not defending these as good reasons. They certainly were not. They were risky,

too risky, and, you know, my mental state, you know, got into somewhat of a -- I suppose panic mode

towards the end, that I was making bets with the final money hoping against hope that I would be able

to pull out of it." The Debtor himself here concedes that after initial losses, his decision to continue

investing in options was "*too* risky" (emphasis added) and not founded on good reasons. He conceded

---

[10] This sentence is taken verbatim from the Stipulation of Facts. The Stipulation of Facts does not specify which
decisions were bad and what precisely made them bad.

that it was not reasonable and rational to continue to invest in options after he had already lost a good

portion of the investment account.

75.     The Debtor went further and conceded that it was inappropriate to invest the Trusts'

funds in options at all: "Now, the options were high risk and inappropriate and I certainly admit that."

Then he equivocated: "but the objective was to make a gain and there was reasonable --reasonable to

think that that could be done. People do it. People make a living at this."

76.     When asked whether he thought it was reasonable and rational to even make the

decision to start investing in options after he had lost over half a million dollars of his own money in the

early 2000s, he answered: "Well, I thought I had learned better how to do this." He submitted no

evidence to corroborate this testimony. What had he learned? How had he learned it? How would it

affect his strategy? What safeguards would prevent a repeat of the earlier results? He offered no

testimony or evidence on these obvious questions. I find that he had not "learned how to do this better"

and that he had no reason to believe otherwise.

77.     From August 2010 to December, 2010, the Debtor invested an average of 91.2% of the

Trust funds per month in options. (Stipulation of Facts, ¶ 47) And from March, 2011 through August,

2011, the Debtor invested an average of 88% of the Trust funds per month in options. (Stipulation of

Facts, ¶ 48)  The Debtor conceded that having 88 percent invested in options was "extremely risky."

During the period from August 2010 through August 2011, the account's investments dropped in value

from $502,714.44 to $382.21.

78.     As he began to lose the Trust funds, the Debtor began to take more risk in an attempt to

gain them back. (Stipulation of Facts, ¶ 49)

79.     The manner with which he invested was not consistent with his father's desire to invest

the funds conservatively. (Stipulation of Facts, ¶ 50)

80.     At the time that the Trusts' funds were rapidly dissipating, the Debtor did not report any

of this to his siblings. (Stipulation of Facts, ¶ 51) Though he had sent them year-end reports for 2006,

2007, and 2008, and notwithstanding his promise in the first report to inform them if his investment

strategy were to change, he sent his siblings no reports for 2009, 2010, and 2011. Nor did the siblings

ask him for information when none was forthcoming.

81.     The Debtor did not believe that he was required to report to his siblings. (Stipulation of

Facts, ¶ 52)

82.     The Debtor acknowledges that if he had just pulled back and invested conservatively,

the investment accounts would not have been depleted. (Stipulation of Facts, ¶ 53)

83.     The Debtor testified and admitted that if he had continued to invest conservatively as

his father desired, the Fidelity Account would be worth $1,200,000 or $1,300,000 today. (Stipulation of

Facts, ¶¶ 54, 72) At trial, the Debtor clarified that the Fidelity Account would be worth $1,200,000 or

$1,300,000 "*less any expenses or distributions*." He did not indicate what expenses or distributions he

had in mind. From August 2009 through December 2011, the period in which the investment losses

occurred, $238,700 was withdrawn or distributed from the Fidelity Account.  The Debtor is here

essentially conceding that had the Trusts' funds remained invested as the elder Mr. Whittaker had

instructed, they would have retained their value and had modest gains.

84.     The Debtor testified at trial that the losses he caused by trading in options were "about

$450,000 net," by which he meant that losses exceeded gains by only $450,000. He adduced no

accounting to support this conclusion. The conclusion is not credible and is contradicted by the

evidence. From August 2009 through December 2011, the period in which the investment losses

occurred, the aggregate value of the Fidelity Account diminished from $1,131,162.91 to $29.21, a drop

in value of $1,131,133.70. Only $238,700 was attributable to distributions of any kind; and the losses

also included $7,708 that was deposited into the account during the period, meaning losses from

investment activity in the Fidelity Account totaled $900,141.70.  Even this figure only roughly approximates, and understates, net losses from options trading. The change in value of account investments was also affected by other, relatively smaller factors:  dividends received on stocks, interest received on bonds, margin interest paid ($23,374.56 in 2009), transaction costs, and gains and losses (mostly gains) from sale of the stocks, bonds, and mutual funds that the Debtor liquidated in order to invest in options. It is clear that by far the predominant cause of loss of investment value was option trading, and that $450,000 vastly understates net losses from option trading.

85.    In addition, the Debtor lost the $38,000 he had transferred from the Fidelity Account to his TradeStation account, again through investing in options.

86.    The Debtor testified that some $730,000 to $780,000 of the depletion of the Fidelity Account was attributable to distributions for gifts and expenses: "There were $408,000 distributed as gifts to the children and grandchildren of Mary and Ben Whittaker. There were $122,000 distributed as expenses to the children and grandchildren and there were $200,000 to $250,000 to -- out of the nest egg to pay for my parents' expenses beyond their income." The Debtor did not indicate when these distributions were made, made no attempt to identify these distributions in account statements, and adduced no corroborating evidence for this testimony. Exhibit A shows that from August 2009 through December 2011, distributions from the account were limited to $238,700, and the Debtor, through counsel, agreed that Exhibit A accurately reflected account activity as reported in the monthly statements for that period. I accordingly find that, from August 2009 through December 2011, only $238,700 of the account's depletion was from distributions of any kind.

87.    The Debtor did not intend, by his investment of Trust funds in options, to injure the Trusts or their beneficiaries. Rather he hoped that they—and he, as a one-fifth residual beneficiary of the Trusts—would profit from his move into options.

88.     The Plaintiffs have not established by a preponderance of the evidence that the

Debtor's investment of Trust funds in options was substantially certain to lead to loss of the funds. The

evidence shows that his options investments resulted in both losses and gains. Had he stopped after his

first month, it would have resulted in modest gains. In the end, losses greatly outnumbered gains. The

strategy was reckless, but it was not substantially certain to lead to loss.

### K. Disclosure and Resignation

89.     The parties' father passed away in January of 2011.  (Stipulation of Facts, ¶ 35)

90.     In early 2012, the Debtor sold the Key West house for $558,000. After payment of the

realtor's commission, the net proceeds were about $530,000, and the Debtor deposited this sum into

the Fidelity Account.

91.     The parties' mother passed away in June of 2012.

92.     In or about June of 2012, the weekend of their mother's passing, the Debtor notified the

Plaintiffs of the massive losses to the investment account for the very first time, and they were shocked

by the news. (Stipulation of Facts, ¶ 69)

93.     The Debtor resigned as trustee of each Family Trust in June of 2012. (Stipulation of

Facts, ¶ 30)  He signed the documents effecting his resignation as trustee on November 6, 2012.[11] The

Debtor conceded that the resignation had been forced upon him: "they [his siblings] probably fired me,

but – we didn't have very much conversation." At the time of his resignation, there was approximately

$500,000 in the Fidelity Account. He was succeeded as trustee of each trust by each of his three siblings.

94.     After the Debtor revealed his Trust investment losses to his siblings, they filed a

complaint against him in Ohio probate court on February 13, 2013.

---

[11] The parties make no attempt to explain the discrepancy between their stipulation that the Debtor resigned the
trusteeship in June 2012 but signed this document only in November 2012, but the discrepancy is immaterial.

95.     On or about April 19, 2013, the Debtor wrote to his siblings in an attempt to dissuade them from going forward with the litigation. In this letter he admitted that he lost approximately $700,000 by conducting risky investments with the Trust funds. (Stipulation of Facts, ¶ 70) Specifically, he stated: "I admit I made too risky investments that lost about $700,000, bringing Mom and Dad's investment accounts down to near zero."

96.     Upon additional questioning, the Debtor acknowledged that at least $450,000 was directly caused by his unauthorized investments, which were contrary to his father's wishes. (Stipulation of Facts, ¶ 71)

97.     As stated above, the Debtor admitted that had he invested the funds conservatively as was the Settlors' desire, the funds would be worth between $1,200,000 and $1,300,000 today. ((Stipulation of Facts, ¶ 72)

98.     Joan and Ben both testified that, had they known about the risky investment strategy that the Debtor adopted, and of the losses that strategy soon began to generate, they would have sought to remove him as trustee. Both testified that they had relied on representations he had made in his report of January 31, 2007: that he was investing in accordance with their father's wishes and would notify them if this changed.

99.     The siblings retained counsel for the state court litigation and to represent them in "the bankruptcy portion of this litigation." They have paid in excess of $300,000 in fees for this representation, of which about $100,000 was incurred for work in the bankruptcy case and, in particular, in the present adversary proceeding.

**JURISDICTION**

The matters before the court are an objection to discharge under 11 U.S.C. § 727(a) and proceedings to determine the dischargeability of asserted claims under 11 U.S.C. § 523(a). They arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the

district court in 28 U.S.C. § 1334(b) and, by a standing order of reference, referred to the bankruptcy

court pursuant to 28 U.S.C. § 157(a). They are core proceedings within the meaning of 28 U.S.C. §

157(b)(1) and (b)(2)(I) and (J) (core proceedings include objections to discharge and determinations of

the dischargeability of particular debts). The bankruptcy court accordingly has authority to enter final

judgment on them.

**DISCUSSION**

The Plaintiffs assert counts under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). A party seeking to

except a debt from discharge bears the burden of proving each element by a preponderance of the

evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In furtherance of the Bankruptcy Code's "fresh

start" policy, exceptions to discharge are narrowly construed. *Palmacci v. Umpierrez*, 121 F.3d 781, 786

(1st Cir. 1997).

**Count I: § 523(a)(2)(A)**

In Count I, the Plaintiffs assert that their claims against the Debtor should be excepted from

discharge under § 523(a)(2)(A), as debts arising from false pretenses, false representations, or actual

fraud. This count was poorly pled. A count under § 523(a)(2)(A) sounds in fraud and therefore must be

pleaded with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake."), made applicable by Fed. R. Bankr. P.

7009. This requirement notwithstanding, the Plaintiffs' allegations of false representations are not

stated with particularity. Rather, they are stated only generally, and in the plural. In the end, only one

false representation was duly noticed and tried. The gravamen of this count is as follows. The Debtor

was obligated to report to the Plaintiffs about the status of the Trusts' holdings and the manner in which

its funds were invested. He was so obligated because, early in his tenure, he told them that their father

had instructed him to invest the Trusts' funds conservatively, that he was doing so, and, most notably,

that he would inform them if this investment strategy changed. The Debtor's investment of Trust funds

in options constituted a dramatic change in his investment strategy, but the Debtor failed to apprise

them of this change and of losses resulting therefrom. These omissions amounted to false

representations that caused the Plaintiffs to believe that the Debtor was continuing to invest

conservatively and that Trusts' holdings were sound and essentially unchanged. These

misrepresentations prevented the Plaintiffs from intervening and thereby averting further losses from

investment in options. In that way, his false representations caused the losses.

The Debtor responds simply that "the Plaintiffs have failed to show that the Debtor obtained

money, property, services or credit as required." This response is dispositive. Section 523(a)(2)(A) states:

> (a)  A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by—
>
>> (A)  false pretenses, a false representation, or actual fraud,
>> other than a statement respecting the debtor's or an
>> insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(A) does not except from discharge "any debt for false

pretenses, a false representation, or actual fraud." Rather, it excepts from discharge "any debt *for

money, property, services, or an extension, renewal, or refinancing of credit*, to the extent obtained by

false pretenses, a false representation, or actual fraud[.]" Here, the Plaintiffs have not shown or even

alleged that their claims against the Debtor are for money, property, services, or credit. Whether or not

they have established that the Debtor's conduct amounted to "false pretenses, a false representation,

or actual fraud," the conduct in question is not alleged to have enabled him to obtain money, property,

services, or credit. As to the count for fraud articulated in the foregoing paragraph, the complaint thus

fails to state a claim for relief under § 523(a)(2)(A).

In closing arguments, Plaintiffs' counsel attempted to remedy this deficiency. He stated that the

evidence shows that the Debtor obtained two sums of money from the Trust—the $107,500 with which

he purchased a Mexican timeshare, and the $38,000 he channeled into his personal investment account—"and actively concealed that despite a duty to report that and that was relied upon . . . by the creditors [the Plaintiffs] and all the other elements." For two reasons, this argument is of no avail.

First, these causes of action are not counts on which the adversary proceeding was tried; the Plaintiffs first specified these particular misrepresentations (nondisclosure of the $107,500 misappropriation, and nondisclosure of the $38,000 misappropriation) as grounds for nondischargeability under § 523(a)(2)(A) only *after* trial, in closing arguments.  A cause of action for nondischargeability under § 523(a)(2)(A) sounds in fraud and must be plead with particularity.  The Debtor was entitled to advance notice of the particular fraud against which he was being required to defend.

Second, and in any event, these facts, too, fall short of stating a basis for relief under § 523(a)(2)(A). They contain no allegation that the money was obtained by false representations, only that false representations enabled the Debtor to conceal misappropriations *that had already occurred*. In addition, an omission constitutes a misrepresentation when there is an obligation to disclose.  Here, the Plaintiffs allege that the Debtor was obliged to disclose his misappropriations, but they cite no source of or basis for the existence of such an obligation, and no such basis is obvious.

I conclude that the Plaintiffs are entitled to no relief under § 523(a)(2)(A).

**Count II: § 523(a)(4)**

Count II contains four separate sub-counts, each for a determination of nondischargeability under § 523(a)(4). In the first ("Count II.i"), the Plaintiffs contend that the Debtor's liability to them for failing to invest the funds as a "prudent investor" is excepted from discharge under § 523(a)(4) as a debt for a defalcation while acting in a fiduciary capacity.  In the second and third ("Counts II.ii and II.iii"), the Plaintiffs contend that the Debtor's liability to them for his unauthorized appropriation for his own use of $107,500 that he used to purchase a time share and $38,000 that he transferred to his personal

investment account should be excepted from discharge under § 523(a)(4) as debts "for embezzlement or larceny" within the meaning of that subsection. And in the fourth ("Count II.iv"), the Plaintiffs contend that the Debtor's failure to inform them of the declining balances in his trust accounts amounted to, and should be excepted from discharge under § 523(a)(4) as, fraud or defalcation while acting in a fiduciary capacity.

### Count II.i: Options Trading as Defalcation While Acting in a Fiduciary Capacity

In their first sub-count under § 523(a)(4), the Plaintiffs contend that the Debtor's liability to them for failing to invest the funds as a "prudent investor" is excepted from discharge under § 523(a)(4) as a debt for a defalcation while acting in a fiduciary capacity. The gravamen of this count is the Debtor's loss of Trust funds by investment of those monies in options. The Plaintiffs contend that this investment strategy was highly risky and for this reason both reckless and inconsistent with the Debtor's fiduciary obligations to the Trusts and their beneficiaries. The Debtor acknowledges that his investment of Trust funds in options was highly risky but states that it nonetheless did not amount to a defalcation for the following reasons: (i) the Trusts expressly gave him broad latitude and authority to determine how the Trusts' assets might be invested, permitting him to invest as he would his own assets; (ii) he did not act with intent to harm the Trusts or the beneficiaries but with intent to benefit them; and (iii) the Plaintiffs have not established that the Debtor acted with the kind of intent that is needed to establish a "defalcation" within the meaning of § 523(a)(4)—the evidence shows that the Debtor acted at worst with recklessness, but reckless conduct can constitute a defalcation only when it is extreme, which, the Debtor maintains, is not the case here.

In relevant part § 523(a)(4) excepts from discharge any debt for "defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). It requires proof of two things: that the debtor have acted as the fiduciary in a fiduciary relationship; and that his or her conduct in that capacity, the conduct that

gave rise to the debt or liability in question, have constituted a defalcation.[12] *Reiss v. McQuillan (In re McQuillin)*, 509 B.R. 773, 787 (Bankr. D. Mass. 2014).

To be acting in a fiduciary capacity, which is a matter of federal and not state law, a party must be acting pursuant to an express or technical trust, not an implied trust. *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 333 (1934). "The usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust relationship." *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687 (1st Cir. BAP 2012) (internal quotations and citations omitted). There is no dispute, and in any event I find, that all three elements of an express trust are present here. The Father's Trust and the Mother's Trust are explicit declarations of Trust. Each evidences a clear intent to create a trust relationship; and, in combination with the Debtor's acceptance of the role of substitute trustee of each trust, each did create a trust relationship with the Debtor that lasted from October 3, 2006 to June of 2012.  I further find that the investments at issue were among the Trusts' assets and constituted part of its *res*; the Debtor stipulated that his parents' three investment accounts, which he later combined into one, were Trust assets when he became trustee in 2006. I further find that the conduct that gave rise to the alleged liability that is the subject of this count—the Debtor's investment of Trust funds in options—was in each instance conduct that the Debtor undertook in his capacity as a fiduciary under the Trusts.[13]

The sole disputed issue is whether the conduct in question amounted to a defalcation within the meaning of § 523(a)(4). "[Defalcation] is not defined in the Bankruptcy Code, and though the term was carried into § 523(a)(4) of the present Bankruptcy Code from § 17a(4) the Bankruptcy Act of 1898 and predates even that act, the legislative history sheds no light on its meaning." *Stowe v. Bologna (In re*

---

[12] I see no material difference between this two-part test and the three-part test articulated in *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687 (1st Cir. BAP 2012), just a recombination of the same elements.

[13] Because I find that all the activity at issue concerned assets of the Trusts, and that the Debtor dealt with these assets as trustee of the Trusts and not by exercise of any power belonging to his parents, any fiduciary capacity he may have had under his parents' powers of attorney is immaterial.

*Bologna)*, 206 B.R. 628, 633-34 (Bankr. D. Mass. 1997); *Central Hanover Bank & Trust Co. v. Herbst*, 93

F.2d 510 (2d Cir.1937) (L. Hand, J.) (tracing use and meaning of defalcation in federal bankruptcy law

since 1841). Two principal questions arise about its meaning in § 523(a)(4). What kinds of acts constitute

defalcations? And with what scienter, fault, or intent must the act have been performed?

Courts have long puzzled over the precise meaning and scope of "defalcation" as it has been

used in the Bankruptcy Code and in earlier federal bankruptcy statutes. See, for example, *Bullock v.*

*BankChampaign, N.A.*, 133 S.Ct. 1754, 1758-61 (2013) ("*Bullock")* and *Rutanin v. Baylis (In re Baylis)*, 313

F.3d 9, 17–18 (1st Cir. 2002) ("*Baylis*"). To understand its meaning, courts have examined defalcation's

dictionary definitions and its context in the statute. *Bullock*, 133 S.Ct. at 1758-61, and *Baylis*, 313 F.3d at

17–20.

Congress first used the term 'defalcation' in an exception to discharge in a federal bankruptcy

statute in 1867. *Bullock*, 133 S.Ct. at 1758.  The Supreme Court's recent survey of its dictionary

definitions, both in 1867 and more recently, show its meaning to be broad:

> [A] law dictionary in use in 1867 defines the word "defalcation" as "the act of a
> defaulter," which, in turn, it defines broadly as one "who is deficient in his
> accounts, or fails in making his accounts correct." 1 J. Bouvier, Law Dictionary
> 387, 388 (4th ed. 1852). See also 4 Oxford English Dictionary 369 (2d ed. 1989)
> (quoting an 1846 definition that defines the term as "'a breach of trust by one
> who has charge or management of money' "). Modern dictionaries contain
> similarly broad definitional language. Black's Law Dictionary, for example,
> defines "defalcation" first as "Embezzlement," but, second, as "[l]oosely, the
> failure to meet an obligation; a nonfraudulent default." Black's Law Dictionary
> 479 (9th ed. 2009) (hereinafter Black's). See also American Heritage Dictionary
> 474 (5th ed. 2011) ("To misuse funds; embezzle"); 4 Oxford English Dictionary,
> supra, at 369 ("monetary deficiency through breach of trust by one who has
> the management or charge of funds; a fraudulent deficiency in money
> matters"); Webster's New International Dictionary 686 (2d ed. 1954) ("An
> abstraction or misappropriation of money by one, esp. an officer or agent,
> having it in trust"); Webster's Third New International Dictionary 590 (1986)
> ("misappropriation of money in one's keeping").

*Bullock*, 133 S.Ct. at 1758. Dictionary definitions thus clearly include the misappropriation of money held

in a fiduciary capacity and the failure to account for any such monies. *Stowe v. Bologna (In re Bologna)*,

206 B.R. at 633 ("Black's Law Dictionary defines 'defalcation' as '[t]he . . . act of embezzling; . . .

misappropriation of trust funds or money held in any fiduciary capacity; failure to properly account for

such funds"). However, the dictionary definitions also encompass, more broadly, "default," "failure to

meet an obligation," and "monetary deficiency through breach of trust": that is, any monetary

deficiency resulting from a breach by a trustee of his or her fiduciary obligation.

The context and use of defalcation in subsection 523(a)(4) supports the conclusion that

Congress intended for defalcation to have this broader meaning.

> Defalcation carries a different meaning than the other behaviors listed in §
> 523(a)(4): embezzlement, larceny, and fraud. See generally 11 U.S.C. §
> 523(a)(4). Typically, embezzlement requires conversion, larceny requires
> carrying away another's property, and fraud requires a false statement.
> *Bullock*, 133 S.Ct. at 1760. By contrast, "defalcation" "can encompass a breach
> of fiduciary obligation that involves neither conversion, nor taking and carrying
> away another's property, nor falsity." *Id.* Rather, "defalcation" requires only a
> "nonfraudulent breach[ ] of fiduciary duty." *Id.*

*LeCann v. Cobham (In re Cobham),* 551 B.R. 181 (Bankr. E.D. N.C. 2016). While defalcation is construed

as conduct "of the same kind" as its statutory neighbors in § 523(a)(4) (fraud while acting in a fiduciary

capacity, embezzlement, and larceny), *Bullock*, 133 S.Ct. at 1760, it should also be construed to "not

make the word identical to its statutory neighbors." *Id.* (citing "[a] reluctance to treat statutory terms as

surplusage"). I therefore conclude that it includes breaches of fiduciary duty other than those that

would amount to embezzlement of trust assets. Provided there exists the necessary level or type of

intent, risk, or scienter (about which more below), defalcation encompasses any breach of fiduciary duty

that results in a monetary deficiency. It includes conduct of the type on which the present complaint is

predicated, imprudent investing of trust funds. It follows, as the Court of Appeals has held, that

"[i]nherent in 'defalcation' is the requirement that there be a breach of fiduciary duty; if there is no

breach, there is no defalcation." *Baylis*, 313 F.3d at 17.

There is nonetheless a limitation on the kind of intent, risk, or scienter that will suffice for a

particular breach to constitute a defalcation. As the Supreme Court held in *Bullock,* a defalcation in §

523(a)(4) requires either (i) moral turpitude, bad faith, or other immoral conduct or (ii) in lieu of these,

an intentional wrong, which includes not only conduct that the fiduciary knows is improper but also

reckless conduct of the kind that the criminal law often treats as the equivalent, such as where the

fiduciary consciously disregards, or is willfully blind to, a substantial and unjustifiable risk that his

conduct will turn out to violate a fiduciary duty. *Bullock*, 133 S.Ct. at 1759. That risk "must be of such a

nature and degree that, considering the nature and purpose of the actor's conduct and the

circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a

law-abiding person would observe in the actor's situation." *Id*. at 1760.

      In view of these rulings, I must decide, with respect to each instance in which the Debtor

invested Trust funds in options, whether the conduct at issue amounted to a breach of the Debtor's

fiduciary obligations under the Trusts, and, if so, whether he committed the breach with the requisite

intent or scienter.

      While the existence or not of a fiduciary relationship, and the breach or not of a trustee's duty in

such a relationship, are questions of federal law, they are informed in large measure by state law. *See*

*Dennis v. Hall (In re Hall)*, 483 B.R. 281, 292 (Bankr. D. Conn. 2012) ("Although the precise scope of the

defalcation exception is a question of federal law, its application frequently turns upon obligations

attendant to relationships governed by state law.").

      Which state's law should apply? Each Trust contains a choice-of-law clause requiring that the

Trust be construed in accordance with the laws of the State of Florida. The Plaintiffs argue that Florida

law should therefore govern. They reason that a federal court sitting in diversity should apply the

choice-of-law rules of the forum state, here Massachusetts, and that Massachusetts would honor a

contractual choice-of-law clause. This argument ignores that this case is here on bankruptcy jurisdiction,

not diversity, and that the choice of law clause was made by the settlor in a trust, not by parties to a

contract. The Debtor has said nothing about choice of law.

The Court must first determine whose choice-of-law rules to apply. "Federal courts are divided on whether the federal choice of law rules or the forum state's choice of law rules apply in bankruptcy proceedings. Compare *In re Gaston & Snow*, 243 F.3d 599, 605–06 (2d Cir. 2001) (using choice of law rules for forum state) with *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995) (using federal choice of law rules)." *In re Kaiser Group International, Inc.*, 2010 WL 3271198, *4 (D. Del. 2010). The issue does not appear to have been resolved in this circuit. For the reasons articulated in *Gaston & Snow*, 243 F.3d at 605–06, and *Kaiser Group International*, 2010 WL 3271198, *4, I will apply the choice of law rules of the forum state, the Commonwealth of Massachusetts.

Although I am unaware of any Massachusetts statute or case law on point, I conclude from *dicta* that the Massachusetts Supreme Judicial Court would likely follow the Restatement (Second) of Conflict of Laws § 268(1) ("A will or other instrument creating a trust of interests in movables is construed in accordance with the rules of construction of the state designated for this purpose in the instrument."), and thus give effect to the choice of law clause in an *inter vivos* trust. *See First National Bank of Mount Dora v. Shawmut Bank of Boston*, 378 Mass 137, 146-47 (1979).[14] This is all the more likely where, as here, the chosen law is also the law of the state in which the settlor both executed the trust and resided at that time, and no evidence indicates that another state has a more significant relationship to the

---

[14] The Supreme Judicial Court stated:

> In construing a trust instrument and rights and obligations under it, the law of the situs of the trust would often be given recognition, particularly when, as here, the trust expressly so directs. See *New England Merchants Nat'l Bank v. Mahoney*, 356 Mass. 654, 656-657, 255 N.E.2d 592 (1970); *National Shawmut Bank v. Cumming*, 325 Mass. 457, 463-464, 91 N.E.2d 337 (1950); Restatement (Second) of Conflict of Laws § 268 (1971); 5 A. Scott, Trusts § 579 (3d ed. 1967). In particular circumstances, there may be reason to look to the law of that jurisdiction with which the testator-settlor had the greatest contact at significant times (such as her domicil at the time of execution of the trust and will), or perhaps one would look to the law of that jurisdiction which the testator-settlor had reason to believe would be applicable. See Restatement (Second) of Conflict of Laws § 268(2) (1971); 11 5 A. Scott, Trusts § 576 (Supp. 1979).

*First National Bank of Mount Dora v. Shawmut Bank of Boston*, 378 Mass. at 147.

trust, much less that application of the chosen state's law would violate strong public policy of a state

having a more significant relationship.  Accordingly, I look to Florida law to understand the Debtor's

fiduciary obligations under the Trusts.

Florida law regarding a trustee's duty to invest trust assets is set forth at Fla. Stat. §§ 736.0901

and 518.11(1)[15] and has been concisely summarized as follows:

---

[15] Fla. Stat. § 518.11(1) states:

(1) A fiduciary has a duty to invest and manage investment assets as follows:

(a) The fiduciary has a duty to invest and manage investment assets as a prudent investor would considering the purposes, terms, distribution requirements, and other circumstances of the trust. This standard requires the exercise of reasonable care and caution and is to be applied to investments not in isolation, but in the context of the investment portfolio as a whole and as a part of an overall investment strategy that should incorporate risk and return objectives reasonably suitable to the trust, guardianship, or probate estate. If the fiduciary has special skills, or is named fiduciary on the basis of representations of special skills or expertise, the fiduciary is under a duty to use those skills.

(b) No specific investment or course of action is, taken alone, prudent or imprudent. The fiduciary may invest in every kind of property and type of investment, subject to this section. The fiduciary's investment decisions and actions are to be judged in terms of the fiduciary's reasonable business judgment regarding the anticipated effect on the investment portfolio as a whole under the facts and circumstances prevailing at the time of the decision or action. The prudent investor rule is a test of conduct and not of resulting performance.

(c) The fiduciary has a duty to diversify the investments unless, under the circumstances, the fiduciary believes reasonably it is in the interests of the beneficiaries and furthers the purposes of the trust, guardianship, or estate not to diversify.

(d) The fiduciary has a duty, within a reasonable time after acceptance of the trust, estate, or guardianship, to review the investment portfolio and to make and implement decisions concerning the retention and disposition of original preexisting investments in order to conform to the provisions of this section. The fiduciary's decision to retain or dispose of an asset may be influenced properly by the asset's special relationship or value to the purposes of the trust, estate, or guardianship, or to some or all of the beneficiaries, consistent with the trustee's duty of impartiality, or to the ward.

(e) The fiduciary has a duty to pursue an investment strategy that considers both the reasonable production of income and safety of capital, consistent with the fiduciary's duty of impartiality and the purposes of the trust, estate, or guardianship. Whether investments are underproductive or overproductive of income shall be judged by the portfolio as a whole and not as to any particular asset.

(f) The circumstances that the fiduciary may consider in making investment decisions include, without limitation, the general economic conditions, the possible effect of inflation, the expected tax consequences of investment decisions or strategies, the role each investment or course of action plays within the overall portfolio, the expected total return, including both income yield and appreciation of capital, and the duty to incur only reasonable and appropriate costs. The fiduciary may, but need not, consider related trusts, estates, and guardianships, and the income

The Florida Probate Code provides that a "trustee shall invest trust property in accordance with chapter 518." Fla. Stat. § 736.0901. Section 518.11 provides that a trustee has "a duty to invest and manage assets as a prudent investor would considering the purposes, terms, distribution requirements, and other circumstances of the trust." Fla. Stat. § 518.11(1)(a). "No specific investment or course of action is, taken alone, prudent or imprudent." *Id*. § 518.11(1)(b). Rather, "investment decisions and actions are to be judged in terms of the fiduciary's reasonable business judgment regarding the anticipated effect on the investment portfolio as a whole under the facts and circumstances prevailing at the time of the decision or action." *Id*. This is "a test of conduct and not of resulting performance." *Id*.

*Figel v. Wells Fargo Bank, N.A. ("Figel")*, 2011 WL 860470 *3 (S.D. Fla. 2011). Under Fla. Stat. § 518.11(1), a trustee's charge is to invest prudently. In determining whether the trustee has acted within this standard, a court may not substitute its judgment for the trustee's but must determine whether a particular investment constituted a "reasonable business judgment regarding the anticipated effect on the investment portfolio as a whole under the facts and circumstances prevailing at the time of the decision or action." Fla. Stat. § 518.11(1)(b).

The Debtor seems to suggest that he should not be held to this or any statutory standard because the Trusts gave him power to invest trust monies as if they were his own and expressly waived any limitation in law that might otherwise apply. This contention is founded on identical language in the two Trusts. Regarding the trustee's authority and discretion to invest, each Trust stated:

> The Trustee shall have the following powers and authorities without any court order or proceeding, exercisable in the discretion of the Trustee: . . .
>
> 4.  To invest and reinvest the properties from time to time comprised in the trust estate or estate in stocks, common and/or preferred, bonds, notes, debentures, loans, mortgages, common trust funds, or other securities or property, real or personal, all limitations now or hereafter imposed by law, statutory or judicial, or by any rule or practice of court now or hereafter in force specifying or limited the permissible investment of trustees, trust, companies or fiduciaries generally or requiring the diversification of investment, being hereby expressly waived, it being the intent hereof that the Trustee shall have full power and authority to deal

---

available from other sources to, and the assets of, beneficiaries when making investment decisions.

> with the trust estate or estates in all respects as though it were the sole
> owner thereof, without order of court or other authority[.]

This language did not free the Debtor, as trustee, from fiduciary obligations, the obligation to invest

prudently, and the restraint of operating within his reasonable business judgment. It removed only

those restraints that might categorically have prohibited certain types and strategies of investment as a

matter of law, without regard to whether or not they fall within his business judgment. Accordingly, his

every investment remained fully subject to § 518.11(1) and its requirement of prudent investment.

The Plaintiffs have repeatedly emphasized the undisputed fact that the parties' father instructed

the Debtor to continue to invest the Trusts' holdings very conservatively. I place no weight on this

instruction in determining the Debtor's investment obligations as trustee. This instruction does not

appear in the Trusts, and the Plaintiffs cite no provision in either Trust requiring the trustee to abide by

instructions from the father. The Debtor was obligated to use his own judgment, not to defer to the

judgment of another.

In determining whether the Debtor's investments in options were within the prudent investor

standard, I begin by separating the investments into two groups: those he made with the $200,000 that

the Debtor maintains he initially "set aside" for investing in options, and those he made with the

remainder of the Trusts' monies. I begin with the latter investments. The relevant findings are as

follows. Investing in options was very risky, and the Debtor knew it to be so. Years earlier he had lost a

great deal of his own money through options investments, and he had no basis to believe that he had

"learned better" how to do this.  Though he did not invest the entire portfolio in options all at once, he

also did not limit the portion of the account that he might expose to this high risk, to bring the risk

within tolerable bounds. When he began losing money, he simply invested more and more and

eventually all of the account in options. The Debtor called his continued investment in options a

"desperate act to try to make it up." He testified:

> I didn't want to stop with losses and so I decided to put some more money
> in in order to make up the gains. I'm not defending these as good reasons.
> They certainly were not. They were risky, too risky, and, you know, my
> mental state, you know, got into somewhat of a -- I suppose panic mode
> towards the end, that I was making bets with the final money hoping
> against hope that I would be able to pull out of it.

The Debtor thus conceded, and in any event I find, that after investment of the first $200,000, his investments of additional monies in options were *too* risky. These investments were not prudent by any measure, all of them well outside the safe harbor of reasonable business judgment. His investments beyond the initial "set-aside" of $200,000 constituted a breach of fiduciary duty.

Review of the investment of the initial $200,000 requires a slightly different analysis. From the Debtor's testimony as a whole, it appears that the Debtor believed, or claims to have believed, that his investment of this first $200,000 in options was justified by the following considerations: (i) though investing in options was very risky, he was managing the risk by subjecting only a portion of the portfolio to options investment; (ii) in essence, the limited amount he was putting at risk was not original capital but substantial gains from his earlier trades in the fall of 2008; (iii) he had ascertained that his parents would never need the assets in the Trusts, that the main purpose of the Trusts was therefore testamentary, the eventual enrichment of the residual beneficiaries, his parents' four children and nine grandchildren, and that this purpose would justify more risk-taking; and (iv) though his own earlier experience with options had been inept and catastrophic, he believed his options-trading skills had improved and therefore that this time he would fare better.

The first and fourth of these contentions are false. The Debtor did not limit the portion of the account that he would invest in options. In fact, his undisciplined strategy was to cope with losses not by limiting the amount at risk but precisely the opposite: by investing more and more, up to the entire account, in attempts to reverse the losses. This strategy put the entire account at risk. It meant that even small, early investments could set in motion a mechanism with no brakes, up to full depletion. The Debtor's claim to have improved his skills as an investor in options is not only unsupported but contrary

to all the evidence. He had not learned even not to channel an entire fund into a single, very risky

category of investment. Nor do I credit his testimony that he *believed* he had "learned better how to do

this."

The Debtor's remaining considerations have some merit but not enough to carry the day. It is

true that, in essence, the first dollars he was putting at risk were not the original corpus of the Trusts but

gains that, had he adhered to his father's extremely conservative strategy, the Trusts would never have

realized. And with these gains, he could afford to be more risky—not to say as risky as he was—than

with the original capital. Still, the Debtor was not putting at risk just these gains. By investing them, he

was starting a process that, given his strategy, might eventually siphon away the entire fund. Also, while

the Debtor was not unreasonable in concluding that his objective was not to protect the existing corpus

to pay for his parents' needs during their lives, but to manage the Trusts for the benefit of the heirs, and

that this adjustment might justify a somewhat less conservative investment strategy, it did not justify

the high degree of risk to which, by starting to invest in options, he was exposing the entire fund.

For these reasons—the high risk of investing in options, the Debtor's known inadequacy as an

options trader, his failure to limit the amount that he might invest in options, and his inability to cope

with a loss other than by throwing good money after bad—I conclude that it was imprudent under

Florida law, and beyond the scope of any reasonable business judgment, for the Debtor to have invested

even the first $200,000, or any sum, in options.  This too constituted a breach of fiduciary duty.

Did the Debtor commit these breaches with the requisite intent or scienter? I find that he did.

Under the Supreme Court's decision in *Bullock*, the necessary intent will be present when the

defalcation is "an intentional wrong, which includes . . . conduct that the fiduciary knows is improper."

Here, the Debtor fully appreciated that he was subjecting the Trusts' assets to a degree of risk that he

could not justify. From personal experience, he knew he did not have the wherewithal to finesse this

risky practice or to limit the damage. He knowingly placed himself in a position in which he felt he could

42

not stop with losses. And, as is evident from the fact that he had already converted portions of the account to his own use, he knew himself to be acting on his own interests as a residual beneficiary and not on the concerns appropriate to a fiduciary. For all these reasons, and each of them separately, I conclude that the Debtor acted with the requisite scienter and intent and that his breaches of fiduciary duty were defalcations within the meaning of § 523(a)(4).

### Count II.ii: Misappropriation of $107,500 as Embezzlement

In the second sub-count under § 523(a)(4), the Plaintiffs contend that the Debtor's liability to them for his unauthorized appropriation for his own use of $107,500 that he used to purchase a timeshare should be excepted from discharge under § 523(a)(4) as a debt for embezzlement within the meaning of that subsection. The Court has already granted summary judgment as to this sub-count and need not address it further at this juncture, except to clarify one point. At the summary judgment stage, the Court noted that it remained unclear whether the $107,500 that are the subject matter of this count include, or are wholly in addition to, the $38,000 that are the subject of Count II.iii. The parties have since clarified, and the evidence makes clear, that the two misappropriations are wholly separate: the $107,500 at issue in the present sub-count does not include any portion of the $38,000 at issue in Count II.iii.

### Count II.iii: Misappropriation of $38,000 as Embezzlement

In the third sub-count under § 523(a)(4), the Plaintiffs contend that the Debtor's liability to them for his unauthorized appropriation for his own use of $38,000 that he transferred to his personal investment account should be excepted from discharge under § 523(a)(4) as a debt for embezzlement within the meaning of subsection (a)(4). The Debtor opposes this count on the facts, arguing that the evidence shows that he did not appropriate the $38,000 for his own use but rather just moved the monies into his own account in order to better administer them for the benefit of the Trusts. That is, the transfer effected no change of ownership, just a change of location.

43

Subsection 523(a)(4) excepts from discharge "any debt for . . . embezzlement[.]" 11 U.S.C. §

523(a)(4). Embezzlement in § 523(a)(4) is "the fraudulent conversion of the property of another by one

who is already in lawful possession of it." *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir.

2010) (defining embezzlement as used in § 523(a)(4)). "[T]o amount to embezzlement, conversion must

be committed by a perpetrator with fraudulent intent." *Id.* "Embezzlement accordingly requires proof

that (i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was

appropriated by the perpetrator in a manner inconsistent with the property rights of the other and the

scope of his or her authorization to deal with the property (iv) with fraudulent intent. *Reiss v. McQuillan*

*(In re McQuillan)*, 509 B.R. 733, 785 (Bankr. D. Mass. 2014); *Zacharikas v. Melo (In re Melo)*, 558 B.R.

521, 558 (Bankr. D. Mass. 2016). "It is knowledge that the use is devoid of authorization, scienter for

short . . . that makes the conversion fraudulent and thus embezzlement." *In re Sherman*, 603 F.3d at 13.

The transfers in question, by four checks totaling $38,000, satisfy the four requirements of

embezzlement. The first two are not disputed: the funds in question belonged to the Trusts, and the

Debtor, as trustee of the Trusts, was lawfully in possession of them. The third and fourth requirements

are disputed. Did the Debtor appropriate the funds in a manner inconsistent with the property rights of

the Trusts and with the scope of his authorization as trustee to deal with the funds? Though the Debtor

denies it, I find by a preponderance of the evidence that the manner of appropriation was inconsistent

with the property rights of the Trusts and with his authorization as trustee to deal with the funds. I do

not base this finding solely on the undisputed fact that he transferred the funds to his and his wife's

TradeStation account; each Trust expressly authorized its trustee "[t]o hold title to stocks, bonds, or

other securities or property, real or personal, *in its own name or in the name of its nominee and without*

*indication of any fiduciary capacity*." Still, this authority to hold trust assets in his own name was not

also authority to treat the assets as his own; the Debtor, as trustee, was authorized to hold the assets in

his own name in order to administer them for the Trusts. This is what he maintains he was doing. I have

found that he did not administer the transferred funds for the benefit of the Trusts. A notation on one of

the four checks indicated that he treated that particular transfer as an IRA contribution. This treatment

is inconsistent with the property rights of the Trusts and with the Debtor's authority as trustee to deal

with the funds. By virtue of this same notation and for other reasons noted above, I find the Debtor's

testimony about the purpose of these transfers and the purpose of his maintaining the funds in his own

account to be not credible.  And, in satisfaction of the fourth requirement of embezzlement, I find that

the Debtor transferred and used these funds as his own with clear knowledge that such use was devoid

of authorization. I conclude that the liability arising from the Debtor's appropriation of these $38,000 is

excepted from discharge under § 523(a)(4).

### Count II.iv: Failure to Inform of Options Trading as Fraud or Defalcation While Acting in a Fiduciary Capacity

In Count II.iv, the Plaintiffs contend that the Debtor's failure to inform them of the declining

balances in his trust accounts amounted to, and should be excepted from discharge under § 523(a)(4)

as, fraud or defalcation while acting in a fiduciary capacity. It is clear that they are relying not on an

affirmative misrepresentation but on an omission that, in the face of a duty to report, amounted to a

misrepresentation. The Plaintiffs are vague about the source of any obligation to inform the residual

beneficiaries of declining balances in the Trusts' accounts.

For this omission to amount to either fraud or a defalcation, it is necessary for the Plaintiffs to

establish that the Debtor, as trustee, was subject to a duty to report, such that the omission amounted

to a representation that there existed nothing to report. In their proposed findings and conclusions, the

Plaintiffs contend, as their only cited basis for a duty to report, that Florida law obligates a fiduciary "to

file the annual accountings to keep the beneficiaries informed of income, expenses, and fluctuations in

value of the trust assets." For this proposition, they cite the case of *McCormick v. Cox (McCormick)*, 118

So.3d 980, 982 (Fla. Dist. Ct. App. 3d. 2013), which in turn cites *Weiss v. Courshon (Weiss)*, 618 So.2d 255

(Fla. 3d DCA 1993) ("Each trust beneficiary has an enforceable right to an account from a trustee."), and

Fla. Stat. §§ 737.303, .3035 (2002). And *Weiss*, too, is based solely on Fla Stat. 737.303.  This statute,

however, was repealed, effective July 1, 2008, and therefore, whatever it may have said, has no

application to the events at issue.  Accordingly, neither *McCormack* nor *Weiss* establishes a duty to

report in this case. Also, *Weiss* clearly was addressing the right to an accounting *upon demand*, as a

remedy, and here there was no demand. *McCormack* is the only basis that the Plaintiffs cite for a duty of

periodic accounting. Having found that it establishes no duty here, I need go no further. No duty has

been established, and therefore the Plaintiff have not established that failure to report was a breach of

fiduciary duty, a defalcation, or a misrepresentation. Judgment shall accordingly enter for the Debtor on

Count II.iv.

**Count III:  § 523(a)(6)**

Count III contains four sub-counts for a determination that certain of the Plaintiffs' claims are

excepted from discharge by § 523(a)(6). Section 523(a)(6) excepts from discharge any debt "for willful

and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §

523(a)(6). It requires injury to another "entity," a defined term that includes a trust, see 11 U.S.C. §

101(15) (in Title 11, "'entity' includes . . . trust"), or to the property of another entity. In addition, the

injury needs to have been both willful and malicious. "Willfulness" requires a showing of intent to injure

or at least of intent to do an act which the debtor is substantially certain will lead to the injury in

question. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "Debts arising from

recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." Id., 523 U.S. at

64, 118 S.Ct. at 978.  "Malicious" requires the injury to have been "wrongful," "without just cause or

excuse," and "committed in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.*,

110 F.3d 853, 859 (1st Cir. 1997). Malice thus has both objective and subjective elements: the injury

must have been objectively wrongful or lacking in just cause or excuse; and the debtor must have

inflicted the injury in "conscious disregard" of her duties, meaning that she has to have been aware that

the act was wrongful or lacking in just cause or excuse. *Burke v. Neronha (In re Neronha)*, 344 B.R. 229, 231–32 (Bankr. D. Mass. 2006); *Old Republic National Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818-19 (1st Cir. 2013) ("An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. The injury must have been committed in conscious disregard of one's duties. Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." (Internal citations and quotations omitted.)); *Zutrau v. Zutrau (In re Zutrau)*, 482 B.R. 704, 713 (Bankr. D. Mass. 2012).

### Count III.i:  Losses from Imprudent Investment as Willful and Malicious Injury

In their first sub-count under § 523(a)(6), the Plaintiffs seeks a determination that the Debtor's liability to them for loss of the Trusts' investments by failing to invest the funds as a prudent investor is excepted from discharge as a debt for willful and malicious injury.  This sub-count fails because the Plaintiffs have not established that the injury satisfies the requirement of willfulness. I have found that the Debtor did not intend, by his investment of Trust funds in options, to injure the Trusts or their beneficiaries. Nor have the Plaintiffs shown that the Debtor's investment of Trust funds in options was substantially certain to lead to loss of the funds.  Judgment shall enter for the Debtor on this sub-count.

### Count III.ii: Misappropriation of $107,500 as Willful and Malicious Injury

In their second sub-count under § 523(a)(6), the Plaintiffs seek a determination that the Debtor's liability to them for his unauthorized appropriation for his own use of $107,500 of entrusted monies, which he used to purchase a Mexican timeshare, is excepted from discharge as a debt for willful and malicious injury. The underlying liability is essentially for tortious conversion of the funds. The injury in question was willful within the meaning of § 523(a)(6): the Debtor deliberately transferred the funds into his own personal account and treated them as his own, investing them in a timeshare that he owned in his personal capacity with his wife, for their own personal use. And the injury was also

malicious within the meaning of § 523(a)(6). Whether he intended this transfer and use of funds to be permanent or merely temporary, a borrowing, it was an unauthorized use and clearly inconsistent with the terms of the Trusts. And, as he appropriated these monies as his own, the Debtor fully understood the wrongfulness of his actions. His actions were wrongful, without just cause or excuse, and committed in conscious disregard of his duties.  Accordingly, the resulting liability, already excepted from discharge under § 523(a)(4), is also excepted from discharge under §523(a)(6).

**Count III.iii: Misappropriation of $38,000 as Willful and Malicious Injury**

In their third sub-count under § 523(a)(6), the Plaintiffs seek a determination that the Debtor's liability to them for unauthorized appropriation for his own use of $38,000 of entrusted monies, all of which he deposited into his and his wife's joint TradeStation account and, from that platform, lost through investing in options, is excepted from discharge as a debt for willful and malicious injury. Again, the underlying liability is essentially for tortious conversion, this time of $38,000 transferred to the TradeStation account in four separate checks. He used the funds to invest in his own name and for his own benefit. These acts, which removed the funds in question from the Trusts and thus injured the Trusts, were willful; the Debtor intended the injury. And the injury was also malicious within the meaning of § 523(a)(6). Use of the funds for his own benefit was unauthorized and clearly inconsistent with the terms of the Trusts, and this would be so even if he merely borrowed the monies and intended to repay them.  As he appropriated these monies as his own, the Debtor fully understood the wrongfulness of his actions. His actions were thus wrongful, without just cause or excuse, and committed in conscious disregard of his duties.  Accordingly, the resulting liability, already excepted from discharge under § 523(a)(4), is also excepted from discharge under §523(a)(6).

**Count III.iv: Losses from Failure to Account and from False Representations
as Willful and Malicious Injury**

In the fourth sub-count under § 523(a)(6), the Plaintiffs contend that the Debtor's liability to them for failing to account to them for his losses from options trading and for failing to inform them that

he was abandoning his father's investment strategy and instead investing in options, should be excepted from discharge as a debt for willful and malicious injury. The Plaintiffs contend that, had the Debtor not misled them into believing that he was continuing to follow their father's conservative investment strategy, they would have intervened and prevented the option trading and some or all of the resulting losses.

This sub-count fails for the same reason as did Count III.i. The injury it complains of is the same; and though the present count is based on a separate basis for liability—misrepresentation, or breach of duty to report and account—it necessarily and ultimately involves the same proximate cause of injury: the Debtor's investment of Trust funds in options.  As I found above, the Debtor did not intend by this act to cause injury to the Trusts or their beneficiaries, and the act was not substantially certain to lead to loss of the funds.  Therefore, even if the Debtor deliberately deceived his siblings and/or breached a duty to inform them, and even if they would certainly have intervened, the resulting injury cannot have been willful within the meaning of § 523(a)(6). Judgment shall enter for the Debtor on this sub-count.

**Attorney's Fees**

The Plaintiffs have demanded an award of attorney's fees for their attorney's efforts in the present adversary proceeding. They also seek a determination that any attorney's fees to which they may be entitled under state law on the claims excepted from discharge are themselves also excepted from discharge.

With respect to the demand for an award of attorney's fees in the present adversary proceeding, the Debtor responds correctly that, except as set forth in 11 U.S.C. § 523(d) (permitting award to debtors against consumer creditors in certain circumstances), which does not apply here, there is no basis in law for a shifting of attorney's fees in nondischargeability litigation. I know of no basis on which I may award attorney's fees to the plaintiff in a proceeding to determine the dischargeability of a debt.  Accordingly, I will deny the Plaintiffs' request for attorney's fees.

However, attorney's fees may be among the damages or relief to which the Plaintiffs may be entitled under applicable non-bankruptcy law on the claims excepted from discharge.[16] If and to the extent that attorney's fees, including but not limited those incurred in this adversary proceeding, are among the damages or relief to which the Plaintiffs are entitled on the claims that are excepted from discharge, those attorney's fees are likewise excepted from discharge. *See Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (holding that any debt for fraud "encompasses any liability from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor"). Although *Cohen* involved a debt for fraud that was excepted from discharge under § 523(a)(2)(A), its reasoning applies equally well to debts for defalcation while acting in a fiduciary capacity and for embezzlement that are excepted from discharge under § 523(a)(4) (excepting from discharge "any debt for" defalcation while acting in a fiduciary capacity or embezzlement) and to debts for willful and malicious injury that are excepted from discharge under § 523(a)(6) (excepting from discharge "any debt for" willful and malicious injury). If the Plaintiffs are entitled under applicable nonbankruptcy law to attorney's fees for the acts that constitute defalcation while acting in a fiduciary capacity, embezzlement, and willful and malicious injury, then those attorney's fees are "debt for" defalcation, embezzlement, and willful and malicious injury that subsections § 523(a)(4) and (a)(6) except from discharge.

---

[16] Those claims are not presently before me. The present adversary proceeding is limited to issues of dischargeability, and I therefore make no rulings on the existence or extent of the Debtor's liability on those claims.

50

**CONCLUSION**

For the reasons set forth above, the Court will, by separate judgment, declare that the Debtor's

liability to the Plaintiffs for the conduct that forms the basis of Counts II.i, II.ii, II.iii, III.ii, and III.iii is

excepted from discharge and dismiss the remaining counts on their merits.


Date:  January 17, 2017

_____
Frank J. Bailey
United States Bankruptcy Judge